



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re: ZYPREXA
PRODUCTS LIABILITY LITIGATION

MEMORANDUM
& ORDER ON FEES
04-MD-01596 (JBW)

------------------------------------------------------------x

THIS DOCUMENT RELATES TO:

ALL ACTIONS

------------------------------------------------------------x

Jack B. Weinstein, Senior United States District Judge:

**Table of Contents**:

I.    Introduction ................................................................................................................. 2

II.   Procedural History ....................................................................................................... 2

III.  Fee Allocation .............................................................................................................. 3

IV.   Basis of Authority in Federal Courts ......................................................................... 4

      A.   Analogy to Class Actions ................................................................................... 4

      B.   General Ethical Supervision .............................................................................. 5

           1.   Law ............................................................................................................... 5

           2.   Application of Law to Facts ...................................................................... 8

V.    Parallel State Law ....................................................................................................... 10

VI.   Conclusion .................................................................................................................. 14



# I. Introduction

By this order the court exercises its power to control legal fees in a coordinated litigation of many individual related cases—in effect, a quasi-class action. Limiting fees is particularly appropriate in the instant litigation since much of the discovery work the attorneys would normally have done on a retail basis in individual cases has been done at a reduced cost on a wholesale basis by the plaintiffs' steering committee.

# II. Procedural History

In April 2004, pre-trial proceedings were consolidated in actions against defendant Eli Lilly & Company for injuries alleged to have been caused by the prescription drug Zyprexa. *See* letter of April 14, 2004 from the Multidistrict Litigation Panel to the Clerk of the Eastern District of New York. After discovery and negotiations overseen by the court-appointed special discovery master and four special settlement masters, in November 2005 the defendant entered into a partial settlement covering some 8,000 individual plaintiffs. *See In re Zyprexa Products Liab. Litig.*, No. 04-MD-1596, 2005 WL 3117302 (E.D.N.Y. Nov. 22, 2005) (approving settlement). Under court supervision, a complex claims administration process was developed. It will be administered by the special settlement masters. *Id.* Three different "tracks" for recovery are provided. The track selected depends on the nature of each plaintiff's injury and the estimated monetary value of the claim. Track A provides for a lump sum of $5,000. Tracks B and C allow substantially higher recoveries. *Id.*

## III. Fee Allocation

On January 3, 2006, the four settlement special masters were directed to consult with the parties in order to arrive at a recommended fee schedule cap and allocation of expenses. *See In re Zyprexa Products Liab. Litig.*, 233 F.R.D. 122 (E.D.N.Y. 2006). They were to suggest fees which were "the lesser of the maximum reasonable fee schedule they recommend, the fee agreed upon between the client and the attorney in an individual case, and the maximum amount permitted under the applicable local state rules or statutes." *Id.* at 122.

Upon consultation with counsel and with members of the plaintiffs' steering committee, the special masters proposed that the court: (1) cap all legal fees for "Track A" settlements ($5,000) at no more than 20%, with a maximum of $500 for costs and expenses to come off the top before computation of fees; (2) cap all other fees at 37.5% of recovery; and (3) work with the firms representing the settling plaintiffs to conduct case-by-case evaluations that might result in further changes in fee caps or allocation of expenses because of "unique circumstances." *See* letter of March 7, 2006 from special settlement master Kenneth R. Feinberg on behalf of the four special settlement masters.

After careful consideration of the complicated and exceptional circumstances posed by this case, this court now adopts the special masters' proposal with two main modifications. First, the court reduces the cap from 37.5% to 35%. Second, in order to guarantee that all attorneys receive adequate but not excessive compensation, the special masters will have the power to vary fee caps upwards to a maximum of 37.5% and downward to 30% in individual cases on the basis of special circumstances; clients and attorneys may appeal to the court from any such adjustments. The special settlement masters will supervise the allocation of costs and

expenses in individual cases; they will be limited to those incurred in individual cases, except for Track A cases where there is a cap of $5000 as stated above.

The costs of the plaintiffs' steering committee in conducting general discovery and making documents and depositions available to all litigants, whether in federal or state courts, shall be paid out of the general settlement fund, not by individual plaintiffs. This allocation is particularly apt in the present case since all litigants, whether in federal or any state court, have access to the materials obtained in pretrial discovery. *See In re Zyprexa Products Liability Litigation*, 04-MD-1596, 2004 WL 3520248, at *4 (E.D.N.Y. Aug. 18, 2004). *See also* letter dated January 30, 2006 to state court judges with Zyprexa cases from assigned federal judge suggesting coordination and cooperation. The amount to be paid from to the plaintiff's steering committee for its discovery and other work shall be approved by the special settlement masters.

In carrying out their duties under this order, the special settlement masters shall act as a group, not individually.

## IV. Basis of Authority in Federal Courts

### A. Analogy to Class Actions

A district court has the explicit power to require reasonable fees in class actions. *See* Fed. R. Civ. P. 23(g)(1)(C)(iii); Fed. R. Civ. P. 23(h); *cf.* Fed. R. Civ. P. 23(e)(1)-(2) (dealing with approval of terms of settlement). *See also In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1296 (E.D.N.Y. 1985). While the settlement in the instant action is in the nature of a private agreement between individual plaintiffs and the defendant, it has many of the characteristics of a class action and may be properly characterized as a quasi-class action subject

to general equitable power of the court. *See* Fed. R. Civ. P. 23(g)(C)(iii); Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 1 ("just . . . determination of every action"); *cf.* Fed. R. Civ. P. 23(e)(1)(2) (dealing with approval of terms of settlement); *Agent Orange*, 611 F. Supp. at 1304-05; *In re Joint Eastern and Southern District Asbestos Litig.*, 129 B.R. 710, 784 (E.D.N.Y. 1991). The large number of plaintiffs subject to the same settlement matrix approved by the court; the utilization of special masters appointed by the court to control discovery and to assist in reaching and administering a settlement; the court's order for a huge escrow fund; and other interventions by the court, reflect a degree of court control supporting its imposition of fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and expenses. *See Asbestos Litig.*, 129 B.R. at 863-69.

No one except the trial judge, assisted by special masters, can exercise this ethical control of fees effectively. Many of the individual plaintiffs are both mentally and physically ill and are largely without power or knowledge to negotiate fair fees; plaintiffs' counsel have a built-in conflict of interest; and the defendant is buying peace and is generally disinterested in how the fund is divided so long as it does not jeopardize the settlement.

### B. General Ethical Supervision

#### 1. Law

The judiciary has a well-established authority to exercise ethical supervision of the bar in both individual and mass actions. *See, e.g., Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 530, 6 L.Ed. 152 (1824) ("[I]t is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling

power, some discretion ought to reside in the Court"). *See also* Charles W. Wolfram, *Modern Legal Ethics* 22-27 (1986). This authority includes the power to review contingency fee contracts for fairness. *See Taylor v. Bemiss*, 110 U.S. 42 at 45-46, 3 S. Ct. 441 at 443-44 (1884) ("This...does not remove the suspicion which naturally attaches to such [contingency] contracts, and where it can be shown that they are obtained...by any undue influence of the attorney over the client, or by any fraud or imposition, or that the compensation is clearly excessive, so as to amount to extortion, the court will in a proper case protect the party aggrieved").

A federal court may exercise its supervisory power to ensure that fees are in conformance with codes of ethics and professional responsibility even when a party has not challenged the validity of the fee contract. *Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982). *See also Farmington Dowel Prod. Co. v. Forster Mfg Co.*, 421 F.2d 61, 90-91 (1st Cir. 1970); *Schlesinger v. Teitelbaum*, 475 F.2d 137, 141 (3d Cir.), *cert. denied*, 414 U.S. 1111, 94 S. Ct. 840 (1973) (holding that the district court had the power to adopt a rule establishing a guideline schedule of fees in personal injury actions for seamen). *Cf. In re Michaelson*, 511 F.2d 882, 888 (9th Cir.), *cert. denied*, 421 U.S. 978, 95 S. Ct. 1979 (1975) (to protect clients from excessive fees and conflicts of interest, the court has authority to inquire into fee contracts). Supervision includes the power to determine that the fee contract was not obtained through undue influence or fraud and that the amount of the fee is not unfair or excessive under the circumstances of the case. *See, e.g., Rosquist*, 692 F.2d at 1111.

The explication of the reasons for reviewing contingency contracts in *Farmington Dowel* is persuasive. This was an antitrust suit filed under the Clayton Act. After plaintiff Farmington Dowel Company prevailed on its claims, the district court determined that $85,000 was a

reasonable attorney's fee pursuant to section 4 of the Act. Upon examining the existing fee contract between Farmington Dowel and its attorneys, however, the district court refrained from awarding counsel any additional fee, in spite of the award required by section 4. It believed any increase in fee beyond that agreed upon in the contract would be unethical. *Farmington Dowel Prod. Co. v. Forster Mfg Co.*, 297 F. Supp. 924, 925-930 (D. Me. 1969).

On appeal, the Court of Appeals concluded that the Clayton Act's fee award was statutorily mandated. Nonetheless, the court noted that the American Bar Association Canons of Professional Ethics place ethical limitations on attorney's fees; it recognized the district judge's authority to determine the maximum fee that would be appropriate within those limits. *Farmington Dowel Prod. Co. v. Forster Mfg Co.*, 421 F.2d 61, 87, 90 (1st Cir. 1970). Accordingly, the court remanded the issue, instructing the district court to award the statutorily mandated "reasonable fees," while using its discretion to restructure the terms of the original agreement so that the total fee would be in accordance with the Canons of Ethics. *Id.* at 90-91.

The *Farmington Dowel* court explained that a client's willingness to abide by his original fee contract "is relevant but not controlling, for the object of the court's concern is not only a particular party but the conformance of the legal profession to its own high standards of fairness." *Id.* at 90 n.62. Excessive fees would adversely reflect on the courts and the bar, providing judges with strong reason to ensure that any fee contract meets reasonable standards. *See also, e.g., Jacobs v. Mancuso*, 825 F.2d 559, 564 (1st Cir. 1987) (the final determination as to the reasonableness of the attorney's fees is firmly entrusted to the discretion of the court); Charles Kocoras, *Commentary: Contingent Fees—A Judge's Perch*, 47 DePaul L. Rev. 421, 422 (1998) ("It is sometimes a difficult enough job to bring about a just result in the substantive

disputes between parties. The idea of getting enmeshed in determining how much a client should pay his lawyer is distasteful and unappetizing. Lawyers' fee issues, whether arising as part of a contingent fee contract or by virtue of statutory or other types of considerations, do not rank high on a judge's menu of things he or she cannot wait to address. But trial judges were not afforded the vote to oversee these matters—we have that responsibility and obligation by virtue of our office.").

Those courts that have considered the matter agree that their supervisory power does not imply a duty to examine every attorney's fee contract. The Court of Appeals for the Seventh Circuit, for example, advocates a case-by-case determination of the need for review. *See Rosquist*, 692 F.2d at 1111 (while "[a]n agreement between two freely consenting, competent adults will most often be controlling. . . . in the circumstances of this case, the district court was right to be wary not to become an unwitting accessory to an excessive fee"). In *Farmington Dowel*, the Court of Appeals for the First Circuit explained that a court's exercising of its supervisory power—an "ethical judgment" requiring the court "to arrive at a figure which it considers the outer limit of reasonableness"—must be "reserved for exceptional circumstances." *Farmington Dowel*, 421 F.2d at 90.

### 2. Application of Law to Facts

While the plaintiffs' attorneys in the present case are highly skilled and have achieved an exceptional result for their clients, there is a danger that adherence to any previously negotiated contingency fee contracts might result in excessive fees. The total settlement amount held in escrow is large, and the over 8,000 individual plaintiffs involved in the settlement are

represented by only a handful of firms, all of whom can be expected to gain substantial fees from their numerous clients' combined recoveries. Yet these firms all benefitted from the effectiveness of coordinated discovery carried out in conjunction with the plaintiffs' steering committee and from other economies of scale, suggesting a need for reconsideration of fee arrangements that may have been fair when the individual litigations were commenced.

The risk of excessive fees is a matter of special concern here because of the mass nature of the case. As the *Farmington Dowel* court recognized, excessive fees can create a sense of overcompensation and reflect poorly on the court and its bar. *Farmington Dowel*, 421 F.2d at 90 n.62. *See also Rosquist*, 692 F.2d at 1111 ("Courts have a stake in attorney's fees contracts; the fairness of the terms reflects directly on the court and its bar."). Public understanding of the fairness of the judicial process in handling mass torts—and particularly those involving pharmaceuticals with potential widespread health consequences—is a significant aspect of complex national litigations involving thousands of parties. These considerations are enhanced where, as here, the Judicial Panel on Multidistrict Litigation has assembled all related federal cases "for coordinated or consolidated pretrial proceedings . . . [to] *promote the just and efficient conduct of such actions.*" 28 U.S.C. § 1407 (emphasis added). Litigations like the present one are an important tool for the protection of consumers in our modern corporate society, and they be conducted so that they will not be viewed as abusive by the public; they are in fact highly beneficial to the public when adequately controlled. *Cf. generally* Lester Brickman, *Lawyers' Ethics and Fiduciary Obligation in the Brave New World of Aggregative Litigation*, 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243 (describing the financial incentives for lawyers bringing aggregate cases as risking both procedural and substantive fairness in some of these cases);

Monograph, Individual Justice in Mass Tort Litigation 79-83 (1995) (describing ethical concerns regarding fees in mass actions).

## V. Parallel State Law

Since this is a series of diversity jurisdiction cases, it is particularly useful to examine state law on fees. The obligation of a federal court to guard against excessive fees is reflected in state law. California, Connecticut, Florida, Illinois, Michigan, New Jersey, New York, Tennessee, Texas, and Wisconsin, among others, have rules or statutes limiting the percentage amounts of contingent fees. *See* Cal. Bus. & Prof. Code § 6146(a); Conn. Gen. Stat. Ann. § 52-251c(b); Fla. Bar Reg. R. 4-1.5(f)(4)(B)(i); Fla. Stat. Ann. § 73.092; *Leonard C. Arnold, Ltd. v. N. Trust Co.*, 506 N.E.2d 1279 (Ill. 1987) (local court rule limiting attorney fees to 25% of recovery when incurred in settlement of personal injury actions of minors was not inconsistent with any Supreme Court rules or statutes, and was consistent with circuit court's role in protecting estate of minors); Mich. Gen. Ct. R. 8.121 (1985); 22 N.Y. Comp. Codes R. & Regs. tit. 22, § 691.20; N.J. Ct. R. 1:21-7; *Am. Trial Lawyers Ass'n, New Jersey Branch v. New Jersey Supreme Court*, 316 A.2d 19 (N.J. Super. Ct. App. Div. 1974) (approving New Jersey Supreme Court rule governing contingency fee contracts); Tenn. Code Ann. § 29-26-120; Tex. Lab. Code Ann. § 408.221; Wis. Stat. § 655.013 (1986). *See generally* Lester Brickman, *The Market for Contingent Fee-Financed Tort Litigation: Is It Price Competitive?*, 25 Cardozo L. Rev. 65, 92 n.105 (2003) (compiling state rules and statutes providing sliding scale or maximum limitations on contingent fees).

Connecticut, Illinois, Massachusetts, Pennsylvania, West Virginia, and other states have

recognized that courts have the general authority to reduce a particular contingent fee if it is found to be "excessive," *XL Disposal Corp. v. John Sexton Contractors Co.*, 659 N.E.2d 1312, 1315 (Ill. 1995), or in violation of the rules of professional conduct, *Beckman v. Gwiazda*, No. CV 90-0439394S, 1991 WL 158156, at *5 (Conn. Super. July 31, 1991). *See, e.g., id.* (a judge may reduce the amount of fee charged if she finds that, based on her knowledge of the case before her, the fees are in violation of Connecticut Rule of Professional Conduct 1.5); *XL Disposal Corp.*, 659 N.E.2d at 1315 (the court is duty-bound to guard against the collection of excessive legal fees, both contingent and fixed); *Snow v. Mikenas*, 370 N.E.2d 1001, 1003 (Mass. 1977) (a judge is authorized to question the reasonableness of a contingency fee on his own motion where the attorney will collect a fee from funds to be distributed through him by court order); *Carol v. Perlmutter*, 41 Pa. D. & C. 702 (1940) (contingent fee contracts must be reasonable and commensurate with the amount of the services performed and the results obtained, and are subject to the supervision of the court as to reasonableness, when questioned by the parties or by interested third parties); *Comm. on Legal Ethics of W. Va. State Bar v. Tatterson*, 352 S.E.2d 107 (W. Va. 1986) (under the Code of Professional Responsibility, Disciplinary Rule 2-106, the attorney has the burden to show reasonableness of contract, and if his or her fee is grossly disproportionate to services rendered and is charged to client who lacks full information about all relevant circumstances, the fee is "clearly excessive," even though the client has consented to the fee).

New York common law, as an example, permitted judges to modify contingency agreements prior to the enactment of that state's modern fee structure, even in cases in which the plaintiffs had executed enforceable contingency contracts. *See, e.g., Gair v. Peck*, 160 N.E.2d

11

43 (N.Y. 1959); *In re Cohen*, 166 N.E.2d 672 (N.Y. 1960). *Gair v. Peck* was an action against the Justices of the New York Supreme Court, Appellate Division, First Judicial Department, seeking a ruling that the Appellate Division lacked the power to adopt a rule regulating contingent fees in personal injury and wrongful death claims and actions. The rule at issue in *Gair* employed a sliding scale, ranging from 50% on the first $1,000 recovered to 25% on any amount over $25,000, or in the alternative, a percentage not in excess of 33⅓% of the total sum recovered. The rule also provided that the receipt, retention, or sharing of fees in excess of those prescribed would constitute the exaction of unreasonable and unconscionable compensation, in violation of Canons 12 and 13 of the Canons of Professional Ethics of the New York State Bar Association. The New York Court of Appeals rejected the challenge, citing Chief Judge Cardozo's thorough opinion in *People ex rel. Karlin v. Culkin*, 162 N.E. 487 (N.Y. 1928), confirming the power of the court to control attorneys within its bar, and finding that "[c]ontingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered." *Gair*, 160 N.E.2d at 48. Noting that the Appellate Division rule provided the court with the option to authorize a larger fee upon an application showing that the prescribed fee would be inadequate, the *Gair* court concluded that the rule was a permissible procedural shortcut, enabling New York courts to effectively prevent the enforcement of exorbitant fees. *Id.* at 52.

The trend in the states is to limit contingent fees in substantial cases to 33⅓% or less of net recovery where fees are large. *See* Cal. Bus. & Prof. Code § 6146(a) (limiting contingency fees in medical malpractice suits to 40% of the first $50,000 recovered; 33⅓% of the next

$50,000; 25% of the next $500,000; and 15% of any amount of recovery over $600,000); Conn. Gen. Stat. Ann. § 52-251c(b) (sliding scale limiting contingent fees in personal injury, wrongful death or damage to property suits to 33⅓% of the first $300,000; 25% of the next $300,000; 20% of the next $300,000; 15% of the next $300,000; and 10% of any amount exceeding $1,200,000); Fla. Bar Reg. R. 4-1.5(f)(4)(B)(i) (schedule limiting contingent fees in personal injury, products liability, and property damage suits to 40% of any recovery up to $1 million; 30% of any portion of the recovery between $1 million and $2 million; and 20% of any portion of the recovery exceeding $2 million in cases where the defendant has filed an answer to the complaint); Fla. Stat. Ann. § 73.092 (limiting contingent fees in eminent domain proceedings to 33% of any benefit up to $250,000; 25% of the benefit between $250,000 and $1,000,000; and 20% of any benefit exceeding $1,000,000); Mich. Gen. Ct. R. 8.121 (imposing a maximum 33⅓% limit of recovery on contingency fees in personal injury or wrongful death suits); N.J. Ct. R. 1:21-7 (providing a sliding scale limiting contingent fees in all tort suits to 33⅓% of the first $500,000 net sum recovered; 30% of the next $500,000 recovered; 25% of the next $500,000 recovered; and 20% of the next $500,000 recovered; on all amounts recovered in excess of $2 million, counsel must make an application to the judge for reasonable fee in accordance with the limiting scheme; where the amount recovered is for the benefit of a client who was a minor or mentally incapacitated when the contingent fee arrangement was made, the fee on any amount recovered by settlement without trial shall not exceed 25%); 22 N.Y. Comp. Codes R. & Regs. tit. 22, § 691.20 (capping contingency fees in any personal injury or wrongful death suit at either 50% of the first $1,000 net recovery; 40% of the next $2,000 net recovery; 35% of the next $22,000 net recovery; and 25% of any net recovery over $25,000, or, if the initial contractual

arrangement between the client and attorney so provides, 33⅓% of any net recovery); Tenn. Code Ann. § 29-26-120 (limiting contingent fees in medical malpractice suits to 33⅓% of all damages awarded); Tex. Lab. Code Ann. § 408.221 (capping contingent fees in worker's compensation lawsuits to 25% of the plaintiffs' recovery); Wis. Stat. § 655.013 (limiting contingent fees in medical malpractice suits to 33⅓% or 25% of the first $1 million, depending on whether the liability is stipulated within a statutory deadline, and 20% of any amount over $1 million). *Cf.* Lester Brickman, *The Market for Contingent Fee-Financed Tort Litigation: Is It Price Competitive?*, 25 Cardozo L. Rev. 65, 91 (2003) (describing the one-third contingent attorney's fee as "standard").

Because the court recognizes the exceptional and complicated nature of this important case, the skilled work of the able attorneys involved in it, and the exceptional result achieved, fees in the present case have not been capped at 33⅓%—almost a national norm—but rather at 35%, with the power in the special masters to depart upwards to a maximum of 37.5% and downwards to a minimum of 30% on the basis of special circumstances in individual cases.

It should be emphasized that the applicable fee under many state laws is less than the maximum fixed by this order. Nevertheless, the imposed cap is considerably less than the 40% or more insisted upon plaintiffs' attorneys in their discussion with the special masters. This order is likely to save tens of millions of dollars for the clients.

## VI.    Conclusion

Fees in all settling actions in this multidistrict litigation shall be determined as follows: (1) all legal fees for "Track A" claims ($5,000) shall be capped at no more than 20%, with a

maximum of $500 for costs and expenses to come off the top before computation of fees; (2) all other legal fees shall be capped at 35% of the client's recovery, regardless of whether the underlying retainer agreement or state law permits for a higher fee; (3) the special masters shall have discretionary authority to conduct case-by-case evaluations and to order reductions or increases of maximum fees down to 30% or up to 37.5% on the basis of special circumstances in individual cases; (4) the special masters shall have authority to ensure that costs and disbursements charged to individual plaintiffs are restricted to those reasonably allocated to the individual case and that they come off the top of the recovery before fee computation; (5) the costs, disbursements and fees of the plaintiffs' steering committee shall be paid out of the general settlement fund rather than by individual plaintiffs and the amount of this payment shall be approved by the special settlement masters; (6) the special settlement masters are only to act as a group and not individually; and (7) clients and attorneys may appeal to the court from any decision of the special settlement masters.

SO ORDERED.

/s/ Jack B. Weinstein
Jack B. Weinstein

Dated: March 28, 2006
Brooklyn, New York